# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

In re:

    JUAN NELSON LAINES,                    Case No. 04-10020-RGM
                                           (Chapter 7)
         Debtor.

## MEMORANDUM OPINION

This case is before the court on the applications for compensation of the chapter 7 trustee and

his counsel.  Except for the applications, the final report was previously approved. The final report

states that the trustee recovered more than $1.1 million  from the sale of two residential properties

(the debtor's home and a rental townhouse) but that the estate is administratively insolvent.  This

is surprising because the trustee's initial motions to approve the two sales stated that he expected

to recover $483,400.00[1] for distribution to the unsecured creditors.  What happened?

## I.  Administration of the Estate

## A.  Avoidance of Fraudulent Conveyances

The debtor filed his chapter 7 petition on January 2, 2004.  He scheduled a townhouse in

which he owned an interest as a co-owner and claimed an exemption of $4,900.  On February 25,

2004, Irwin Mortgage filed a motion seeking relief from the automatic stay as to the townhouse.

The trustee objected, stating that there was "substantial equity in the premises," that the debtor had

transferred it for no consideration to the other co-owners and that the trustee intended to file a

---

[1]This was after deducting the trustee's prospective fee and administrative expenses other than attorney's  fees.
He anticipated $545,650 after all administrative expenses other than his trustee's fee and his counsel's fee.

complaint to avoid the transfers.  The matter was continued ten times until  March 15, 2005, when

a consent order was entered granting relief from the stay unless the trustee paid the claim in full

within 120 days.  Irwin Mortgage did not file a proof of claim.

Two days after Irwin Mortgage filed its motion for relief from stay, JP Morgan Chase Bank

filed a motion for relief from the automatic stay seeking relief as to the debtor's home which the

debtor had not scheduled.  JP Morgan asserted that the debtor borrowed $344,000 on November 28,

2000, and secured the debt by a first trust on the house.  It further alleged that the debtor transferred

the house by a deed of gift dated March 18, 2001, to Ana E. Laines and himself as tenants by the

entirety with the common-law right of survivorship and that they transferred the house by a deed of

gift dated October 7, 2003, to Ana E. Laines and Fidel Rovira.  Copies of the two deeds of gift were

attached to the motion.  The trustee objected to the motion stating that there was "substantial equity

in the premises," that the debtor had transferred it for no consideration to the other co-owners and

that the trustee intended to file a complaint to avoid the transfers.  JP Morgan withdrew its motion

for relief.  It did not file a proof of claim.

The trustee filed a complaint on March 31, 2004, against the debtor and the transferees[2]

seeking to avoid the transfers of the townhouse and the house as fraudulent and voluntary

conveyances under both the Bankruptcy Code and the Virginia Code, and to deny the debtor a

discharge.  The trustee was successful.  The properties were recovered and the debtor was denied

a discharge by an order entered on February 16, 2005.  *See Gold v. Laines (In re Laines),* 352 B.R.

397 (Bankr.E.D.Va. 2005).

---

[2]The trustee did not include either mortgage lender or any lienholder as a party to the complaint.  Jose Alvarez, a record owner of a one-fourth interest in the townhouse  when the trustee filed his complaint, was not joined as a party. Laines, his wife and Perez conveyed the property to themselves and Alvarez by a post-petition deed dated February 4, 2004 and recorded February 13, 2004.

## B.  Sale of the Properties

The trustee immediately proceeded to market the properties.  A realtor was employed and the properties were sold.  Motions to approve the sales were filed on March 21, 2005, for the townhouse, and March 30, 2005, for the house.  The townhouse sale motion came on for a hearing first.  There was no objection to the sale.  However, the United States appeared at the April 12, 2005 hearing.  It consented to the sale free and clear of its docketed criminal restitution judgment.  The motion did not mention the docketed judgment or request a sale free and clear of liens under Bankruptcy Code §363(f).  The trustee explained that the debtor was convicted of a federal felony after the filing of the bankruptcy case and that the restitution judgment was a part of his sentence. The judgment was docketed on December 29, 2004, after the trustee filed his complaint.  With that explanation, the sale was approved.  The trustee prepared a draft order which was rejected because it contained broad language that the sale was free and clear of all non-consensual liens arising after the transfer that was avoided.  No liens or lienholders were identified in the order.  No such relief had been requested by the trustee.  The court requested that the draft  order be modified.  It was. The new proposed order recited seven previously undisclosed docketed judgments including the United States' restitution judgment.  It also recited that the judgment liens did not attach to the property.   The lienholders were not parties to the adversary proceeding and had not been served with the motion to sell.  It was clear that the additional relief requested could not be granted and that the two properties could not be sold without the relief requested.  The court withdrew its oral ruling granting the motion to sell.  *See In re Laines,* 352 B.R. 410 (Bankr.E.D.Va. 2006).

The trustee filed amended motions to sell the two properties, this time free and clear of the seven docketed judgments.  He served the affected parties.  The motion for sale of the house also

sought to sell the house free and clear of a previously undisclosed deed of trust granted by the then-record owners of the house (which did not include the debtor) to secure Kamal Patel and recorded on January 12, 2005, a little more than one year after the debtor filed his petition and almost ten months after the trustee commenced his fraudulent conveyance action. Both motions were identical to the original motions except they added the lien information and requested the sales be free and clear of judgment liens, and in the case of the house, of the post-petition deed of trust.

The motions to sell free and clear of liens stated that the trustee anticipated $483,400 to be available for distribution to unsecured creditors (after the payment of the costs of sale and his trustee's fee): $217,350 from the townhouse, and $266,050 from the house.[3] The motion did not discuss the impact of the potential judgment liens. The debtor scheduled all of the potential judgment liens as unsecured claims, four judgments in favor of individuals totaling $3,872;[4] John Wagner Assoc., in the amount of $21,585.86;[5] and St. Anna's Home in the amount of $221,871.[6] The United States filed a proof of claim on April 25, 2005, asserting an unsecured post-petition claim of $401,000 for its restitution judgment.[7] Patel claimed a post-petition lien of $200,000.

Had the trustee discussed the impact of the potential liens, he could have stated from the information contained in his pleadings and the court's record that there should be between $236,000

---

[3]He anticipated $545,650 after payment of the costs of sale and before the trustee's fee and his counsel's fee: $238,850 from the townhouse and $306,800 from the house.

[4]None of the four individuals filed a proof of claim.

[5]John Wagner Assoc. subsequently filed a proof of claim asserting a claim of $25,833.12.

[6]St. Anna's Home filed a proof of claim on June 23, 2004, asserting an unsecured claim of $221,871 arising from a judgment entered in the Circuit Court of Fairfax County, Virginia, the situs of both properties.

[7]The Internal Revenue Service filed a separate proof of claim asserting a priority tax claim of $76,627.97 and a non-priority tax claim of $12,245.32. This proof of claim is not material to this discussion except that if there were no administrative insolvency, its priority tax claim would be paid before any other unsecured claim.

and $483,400 (both after payment of his trustee's fee) available for distribution to unsecured creditors. This gives little weight to the United States' post-petition restitution order[8] or Patel's post-petition deed of trust.[9] The lower end of the range gives full effect to St. Anna's docketed judgment. It accounted for the bulk of the uncertainty in the range of possible distribution to unsecured creditors from $236,000 to $483,400, both after the costs of sale and the trustee's fee, but before the trustee's attorney's fee.

The trustee was authorized to sell the two properties free and clear of liens and resolve the validity of the liens at a later date. The townhouse went to closing on June 7, 2005. The trustee received $175,727.07 after the payment of the first deed of trust. He had estimated in his motion to sell that he would receive $261,350.[10]

---

[8]The United States faced a challenging task. Its restitution judgment was entered post-petition and docketed post-petition against one property that was not in the name of the debtor and the other in which the debtor held a one-fourth interest of record. In any event, the lien, if valid, was clearly subordinate to all the other asserted or potential judgments and the United States consented to the sale free and clear. For a discussion of a criminal restitution judgment entered pre-petition but docketed post-petition *See In re Reasonover,* 236 B.R. 219, 233-237 (Bankr.E.D.Va. 1999) *remanded on other grounds* 238 F.3d 414 (4th Cir. 2000) (unpublished opinion) (remanded to consider application of 11 U.S.C. §550(b)) *on remand* 2001 WL 1168181 (April 16, 2001).

[9]The trustee filed a memorandum of lis pendens prior to Patel recording his deed of trust.

[10]The court added back into the trustee's estimate the real estate agent's commission ($22,500) and the trustee's anticipated fee ($21,500) because neither were paid at closing and remained to be paid from the $175,757.07 actually received.

The trustee's first contract for the sale of the house approved by the court did not close.[11]

He obtained a second contract and filed another motion to sell the house free and clear of liens

which was granted.   He estimated that there would be $342,500 available for distribution to

unsecured creditors, before payment of the real estate agent's commission, the trustee's fee and his

---

[11]On June 8, 2005, the trustee requested an emergency hearing to amend the order of sale for the house.  His memorandum of points and authorities stated in full:

### MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF MOTION TO AMEND

1. On May 26, 2005, this Court granted the Trustee's Amended Second Motion to Approve Sale, authorizing the sale of 1904 Great Falls Street, McLean, Virginia.

2. A dispute then arose between the contract purchasers and the Trustee concerning the sales price and condition of the property.

3. In order to resolve the dispute, the Trustee has agreed to a revised purchase price of $750,000.00 and a credit at closing of $2,400.00  The price reduction was necessitated by a number of factors, including the disappearance of appliances that were supposed to convey, lack of utility service and water damage caused by the former occupant.

4. The Closing is scheduled to take place June 9, 2005.  While the parties can delay the closing by agreement, the purchasers' loan commitment expires on or about June 15, 2005.  Due to fluctuations in interest rates, the lender will not guarantee the same rate past the loan commitment expiration date.

WHEREFORE the Trustee requests that the sale of the Property free and clear of all liens and encumbrances on the revised terms be approved.

The footnote stated:

The order submitted did not contain the full name of one of the buyers, and was subject to interpretation regarding the lien of Kamal Patel. While neither would have required amendment of the order, the proposed order resolves those issues as well.

A hearing on shortened notice was granted.  Surprisingly, the purchasers appeared in person with counsel.  Although the motion reads as if there was an agreement between the trustee and the buyers, they objected to the motion.  They asserted, and the court found, that there was a mutual mistake of fact with respect to the purchase price, the purchasers believing it to be $750,000 and the trustee believing it to be $760,000 as stated in his motion to sell.  The discrepancy had only recently been discovered, the purchasers not having seen the trustee's motion to approve the sale.  The court concluded that there was no meeting of the minds as to a material term of the contract, the sales price, and that there was no contract between the parties.  The sales order was vacated and the trustee's motion to amend was denied.  Obviously, the purchasers had changed their minds and utilized the error to get out of the contract.

counsel's fees.  The house went to closing on August 30, 2005.  The trustee received $174,628.05 after payment of the first trust.  The real estate agent's commission, the trustee's fee and his counsel's fees had yet to be paid from this amount.

## C.  Resolution of Asserted or Potential Liens

The liens that attached to the two properties, if any, were transferred to the proceeds of $350,355.12 the trustee received from the sale of the two properties.  The trustee was faced with eight claimants.  Seven held docketed judgments.  They, and the date that their judgments were docketed, were:  St. Anna's Home (November 29, 2001); John Wagner Assoc. (November 17, 2003);  Hernan Aguirre (December 5, 2003);[12] Oscar Bladmir Lopez (December 8, 2003); Jose Donaldo Aguirre (December 23, 2003); Maximo Portillo (December 23, 2003);[13] and the United States (December 29, 2004).  The eighth claimant was Patel who claimed a lien only on the house by virtue of a deed of trust recorded on January 12, 2005.

The four individuals, Hernan Aguirre, Lopez, Jose Donaldo Aguirre and Portillo, obtained judgments for unpaid wages.  They were all represented by the same attorney who advised the trustee by letter dated May 24, 2005, that Lopez and Hernan Aguirre had been paid in full.

The trustee filed a complaint on June 1, 2005, seeking to determine the validity and extent of the six remaining potential liens.  Three claims were resolved by consent, one was disallowed, and two remained liens.  The first settlement was with John Wagner Assoc.  They agreed that the

---

[12]The order authorizing the sales of the properties free and clear of liens states that the date was December 5, 2004.  However, the judgment number indicates that it was December 5, 2003.

[13]Both Jose Donaldo Aguirre's and Maximo Portillo's judgments were docketed the same day; however, the judgment numbers reflect that Aguirre's was docketed first.

7

lien did not attach to either property, that John Wagner Assoc., could file a late proof of claim and that the proof of claim would be allowed as a tardily filed proof of claim under Bankruptcy Code §726(a)(2)(C).  The effect was that no distribution would be made to the claimant.  The settlement was approved by the court without objection.  John Wagner Assoc., filed its proof of claim on August 18, 2005.

The second settlement was with the United States.  It was on the same terms as the John Wagner Assoc. settlement.  It was also approved by the court without objection.  The United States had previously filed a late proof of claim on April 25, 2005.  As a practical matter, the United States would not receive a distribution on its claim.  Like the John Wagner Assoc. proof of claim, it was subordinated to the full payment of all timely filed proofs of claims.

The third settlement was with St. Anna's Home.  Shortly after St. Anna's Home's motion to dismiss was denied, the trustee and St. Anna's Home reached a settlement.  *See Gold v. United States (In re Laines),* 352 B.R. 420 (Bankr.E.D.Va. 2006).  The trustee stated in his March 13, 2006 motion to approve the settlement, that St. Anna's Home asserted a secured claim of $202,000 which, with interest, was about $310,000.  The trustee had sales proceeds of about $351,000.  The settlement, which was approved without objection, was for an immediate payment to St. Anna's Home of $167,000 in full satisfaction of its claim.  The motion set out a revised distribution  which showed a mere $11,000 available for unsecured creditors.  The anticipated distribution was as follows:

|  |  |
|---|---|
| Net Proceeds of Sale | $351,000.00 |
| Less: | |
| St. Anna's Home | $167,500.00 |
| Trustee's fee | $ 57,000.00 |
| Trustee's attorney's fee | $ 48,000.00 |
| Real estate commissions | $ 67,500.00 |

8

| | | |
|---|---|---|
| Balance available for | | |
| unsecured creditors | $ 11,000.00 | |

The trustee proposed a settlement with Patel before he settled with St. Anna's Home.  He proposed that Patel be allowed a secured claim of $55,000; an allowed unsecured claim of $100,000 that would be paid pro rata with all allowed timely filed unsecured claims; and an allowed unsecured claim of $95,000 subordinated to all other unsecured claims.  St. Anna's Home objected.  It argued that Patel was not a bona fide purchaser for value without notice so as to be protected by the recording statutes.  The trustee, it argued, had filed a memorandum of lis pendens on October 9, 2004, in the Circuit Court of Fairfax County, the county in which the property was situate.  This was more than three months before Patel recorded his deed of trust.  In Virginia, "The lis pendens was binding on Patel 'from the time [the] memorandum of lis pendens .  .  . [was] admitted to record in the clerk's office of the circuit court of the county .  .  . wherein the property is located.' Va.Code §8.01-268."  St. Anna's Home's Objection to Motion to Approve Settlement at 3.  St. Anna's Home made other arguments, but this was clearly the most potent.  It concluded that:

> The Trustee's Motion states that 'Patel .  .  . has raised a number of defenses which, if proven, could bar recovery in whole or in part.'  It is hard to imagine what defenses Patel could raise that warrant a generous settlement such as the Trustee has proposed.  It appears that the Trustee's interest in the real estate was clearly both senior and superior to Patel's.

Objection at 2.  Three weeks later, on October 11, 2005,  the trustee withdrew the proposed settlement.  He later filed a motion for summary judgment using St. Anna's Home's argument and prevailed.

The trustee sought a default judgment against Portillo and Aguirre because they had not answered the complaint.  The motion was granted as to the house but denied as to the townhouse. The records in the main case and the two adversary proceedings show, on their face, that the debtor

was a one-third co-owner of the townhouse at the time Portillo and Aguirre docketed their judgments

on December 23, 2003.[14]  Their judgments attached to the one-third interest at that time.  *See Gold*

*v. United States (In re Laines),* 352 B.R. 416 (Bankr.E.D.Va. 2006).  Portillo and Aguirre are the

only two remaining defendants in the adversary proceeding.  The trustee has taken no further action

in the adversary and has effectively abandoned any further avoidance claim against them.[15]

### D.  Income Tax Liability of Estate

The trustee consistently stated in his pleadings that he did not expect tax consequences to

the estate from the sale of the properties.  He stated this in each of his five motions to sell the

townhouse and the debtor's home.  His final report lists the bankruptcy estate's federal income tax

as $17,298 and Virginia income tax as $7,825.

### E.  Summary of Trustee's Final Report

The trustee reported that he received $1,141,186.85 from the sale of the two properties and

interest on the estate's funds.  Secured creditors other than Portillo and Aguirre have been paid

$956,775.95 (83.84% of the estate).  At the time the trustee filed his final report he had $184,410.90

on hand.  The administrative expenses were projected as:

|  |  |
|---|---|
| Trustee's fee | $57,485.61 |
| Trustee's expenses | 100.15 |
| Trustee's attorney's fee | 44,583.00 |
| Trustee's attorney's |  |

---

[14]The Alvarez deed was recorded February 13, 2004.

[15]The judgment liens attached on the debtor's property on December 23, 2003, 10 days before the debtor filed his petition.  The trustee did not plead an avoidance action under Bankruptcy Code §547 and it is now too late. Bankruptcy Code §546(a).

| | |
|---|---|
| expenses | 1,698.93 |
| Trustee's accountant's fee | 2,328.45 |
| Real estate commissions | 67,500.00 |
| Income taxes | 25,123.00 |
| | |
| Total | $198,819.14 |

With the projected administrative expenses, the estate is administratively insolvent to the extent of

$14,408.24. That insolvency is shared pro rata among all the administrative expense claimants.

Each, according to the trustee, would receive 92.75309% of his claim. The trustee anticipated no

distribution to priority or general unsecured creditors. The court approved the trustee's final report

except for the applications for compensation and authorized a pro rata disbursement to the

administrative expense claimants, assuming the trustee and his counsel were awarded the fees

requested.


## II.  Discussion

### A.  Review of Fee Applications

The issues remaining before the court are the allowance of the trustee's compensation and

his attorney's compensation. While no objection was filed, the court has an independent duty to

review the fee applications.[16] Bankruptcy Code §330(a)(2); *In re Market Resources Development

Corp.,* 320 B.R. 841, 845 (Bankr.E.D.Va. 2004); *In re Hobbs,* 108 B.R. 93 (Bankr.D.Md. 1989)

(independent review of trustee's final report). The court observed in *In re Great Sweats, Inc.,* 113

B.R. 240, 242 (Bankr.E.D.Va. 1990), that "The Court's responsibility in awarding fees is great, as

each creditor individually has little reason to object to requested compensation due to the costs

---

[16]The United States Trustee appeared and noted that the trustee's and counsel's hourly rates exceeded those
generally allowed in this court.

incidental to the objection which it would incur compared to the possible amount of recovery from the estate. The Office of the United States Trustee, understaffed as it is, offers some solace . . . but the ultimate responsibility lies with the Court." *Id. See also In re Franklin,* 210 B.R. 560, 562 (Bankr.N.D.Ill. 1997) ("Critical review of uncontested motions, moreover, is consistent with a basic legal principle – that courts are not required to grant a request for relief simply because the request is unopposed."). It is understandable why no unsecured non-priority creditor raised any objection: the likelihood of receiving any distribution is remote. Only the Internal Revenue Service, which is the sole priority claimant, can possibly benefit from reduced fees. But, before the IRS can benefit, the balance of the unpaid administrative claims must be paid.

In this case, where the trustee's administration resulted in an administrative insolvency when the trustee had projected a $483,400 distribution to unsecured creditors, the determination of reasonable fees for the trustee and his counsel requires further examination of the administration of the case and the handling of the litigation. Describing the history of the case may explain how the trustee ended up with an administratively insolvent estate, but it does not explain why. Counsel sought to explain the administrative insolvency by focusing on the last settlement, the settlement with St. Anna's Home on March 13, 2006. The trustee's notice of the settlement stated his then-expected distribution of $11,000 to unsecured creditors. Counsel explains that at that time, the trustee did not expect a tax liability. The trustee discovered that there would be a tax liability of $25,123 only after the settlement. Thus, counsel mistakenly argues, the administrative insolvency was caused by the unanticipated tax liability of the estate. This is too narrow a focus. The court looks at the entire administration of the case. The question is why the trustee's first estimated

distribution to unsecured creditors of $483,400 proved a chimera.[17]  The income tax liability does not begin to account for the discrepancy.  It was only 5.2% of the first estimated distribution to unsecured creditors.  It was not the cause of the administrative insolvency, only the last in a series of miscalculations.

## B.  Decision to Administer Asset

This case is an administrative insolvency because the trustee and his counsel failed to properly analyze the case at its inception.  Before a trustee commences the process of recovering and selling an asset, he must  first evaluate the asset to determine whether recovering and selling it will likely benefit the estate.  This is a trustee duty to be performed before the matter is referred to counsel.[18]   If he concludes that the property is burdensome to the estate or that it is of inconsequential value or benefit to the estate, he should abandon it.  Bankruptcy Code §554.

The first issue this trustee should have considered before he filed his complaint to avoid the transfers was whether the sale of the house or the townhouse – if recovered – would result in a meaningful distribution to unsecured creditors.  The test is what the trustee should reasonably have known at that time. Bankruptcy Code §330(a)(3)(C).  Hindsight – a retrospective analysis – is not the standard.  The trustee must make a prospective analysis.

The analysis is straight-forward.  The trustee should have determined the reasonable value of the properties, the liens against them, the anticipated costs of sale, the income tax consequences

---

[17]The $483,400 estimate was **after** all administrative expenses (including the trustee's fee) except attorney's fees.

[18]Some circumstances require assistance of counsel to enable the trustee to reach his decision.  While the advise of counsel or other professionals may be necessary and is entirely appropriate, the trustee cannot delegate the decision to counsel under the guise of evaluating the potential issues or the asset.

to the estate, the litigation risks, the likely costs of litigation and his likely trustee's fee.  The net amount is the likely benefit to the estate.

### 1.  Market Analysis

A market analysis is critical.  A trustee will typically obtain a real estate agent's opinion of value, review tax records and comparable sales on internet sites maintained by local governments or utilize other reliable information.[19]   This is not the focus of this examination of the trustee's administration of this estate. Rather, the court is concerned with the change in the trustee's expectations of the benefit to the estate based the actual contract sales prices, not the trustee's initial evaluation of the properties' market values.  This is not a case where the asset sold at a price substantially less than anticipated.

### 2.  Title

The trustee should have obtained title reports or bring downs.[20] They are important and relatively inexpensive.  The Statement of Financial Affairs underscores their importance in this case. It raised red flags.  Eight judgments were listed in answer to Question 4.  Three were listed as paid. The rest were unsatisfied.  One of the unsatisfied judgments was in favor of St. Anna's Home.  It

---

[19]While interesting, a trustee must be skeptical of a debtor's self-valuation.  Some are very accurate.  Others are tainted with hopefulness or hopelessness.

[20]This is not to suggest that every trustee in every case must obtain a full title report before selling real estate. He must be reasonably confident about the status of the title, including liens or encumbrances, and have reasonable pay-offs.  There are different concerns in filing a law suit.  Fed.R.Bankr.P. 9011 establishes minimum standards for pleading factual matters.  Title reports identify issues and parties.  They assist in the drafting of an effective complaint.  They may provide evidence supporting a claim of a fraudulent or voluntary conveyance.  They may be critical in proving a case at trial.  Thus, the role of a title report is different when a trustee is selling property than when he is litigating title or seeking to recover it.

was listed as having obtained a judgment in Fairfax County Circuit Court. While the judgment

amount was not stated in the Statement of Financial Affairs, the claim was listed as an unsecured

claim in Schedule F in the amount of $221,871. The significance of the information that the

judgment was obtained in the Fairfax County Circuit Court is that circuit court judgments are

automatically docketed in the court in which they are rendered. The judgment was obtained in

Fairfax County. Both properties are situate in Fairfax County. The trustee was on notice of a

potentially significant judgment lien against the properties.[21] The fact that the properties had been

conveyed in 2001 also raised the possibility – which materialized – that the transferees encumbered

the properties. Those obligations would not show up on the debtor's schedules because he was not

obligated on them.[22] In this case, the title reports would have revealed multiple deeds of trusts and

six docketed judgments that were not disclosed on Schedule D, "Creditors Holding Secured Claims."

### 3. Liens

The trustee should have obtained reasonably reliable pay-offs of the liens and encumbrances.

---

[21]The fact that the debtor scheduled St. Anna's Home as unsecured rather than secured only further emphasizes the need for a title report. Debtors frequently mischaracterize judgment liens as unsecured claims, in large part, because they do not know when a judgment has been docketed.

[22]Wachovia Bank filed a motion to intervene in the fraudulent conveyance suit on March 2, 2005. The house was conveyed from the debtor and his wife who held it as tenants by the entirety to the debtor's wife and Fidel Rovira by a deed of gift dated October 7, 2003. Wachovia's motion states that Ana Laines (the debtor's wife) and Rovira obtained a $122,000.00 credit line secured by a credit line deed of trust on the house after the transfer. (The motion does not state when the credit line deed of trust was recorded or when the loan was made. The debtor filed bankruptcy within 90 days after the deed of gift.) As of January 28, 2005, the outstanding balance was $123,475.97. At the closing on the house on August 30, 2005, Wachovia was paid $124,362.59. The debt was not scheduled by the debtor. None of the time records – either the trustee's or counsel's – reflect any investigation into this transaction, particularly, when the credit line deed of trust was recorded and when the advances were made. Were any advances made after the fraudulent conveyance suit was filed? Would they have been made if Wachovia was aware of the suit? Would a timely memorandum of lis pendens have affected the transaction? *See* discussion of memorandum of lis pendens and Patel's deed of trust, below.

The debtor's schedules, mortgage company statements, the proofs of claims, pleadings such as motions for relief from stay and a title report are sources of information as to pay-offs.  A pay-off statement from each lender is the best information.  A title report clarifies who holds liens against the property.  The trustee has to reasonably determine their extent.  The failure to identify all lienholders and to obtain accurate pay-offs is the principal reason why this estate is projected by the trustee to be an administrative insolvency.  The trustee estimated the pay-off of the mortgages on the house at $400,000 on three occasions: March 30, 2005, April 29, 2005 and July 6, 2005.  In fact, the pay-off on August 30, 2005, was $572,922.59; $448,560.00 to the first trust holder, and $124,362.59 to Wachovia Bank, a lienholder the debtor was not required to and did not schedule, but was known to the trustee when he filed his sales motions.  The difference accounts for $172,922.59 of the shift from solvency to insolvency.[23]  The trustee's estimated pay-off of the mortgages on the townhouse were also wildly wrong.  The pay-offs were 186% of the trustee's estimate.  The four pay-offs totaled $195,322.48.  The trustee's estimate was $105,000.  This error accounts for another $90,000 on the road to insolvency.  The $90,000 includes $21,200 paid to Jose Alvarez who ostensibly held a 25% ownership interest in the townhouse.

## 4.  Tax Consequences

The trustee should have estimated the income tax consequences of the sales to the estate. Tax consequences are a constant concern for trustees.  In each of the trustee's five motions to sell, he expressly addressed the income tax consequences.  In each instance he stated that he did not

---

[23]It is not at all clear why the trustee's three motions for sale omitted the Wachovia second trust.  Wachovia first contacted the trustee's counsel on January 28, 2005, two months before the trustee's first notice of sale of the house. Wachovia filed its motion to intervene on March 2, 2005, and stated its outstanding balance as of January 28, 2005, which was $123,475.97.  The August 30, 2005 pay-off was $124,362.59.

16

expect any tax consequence to the estate. The statement is not explained and no allowance was made for any tax liability. The application to retain an accountant was filed on August 16, 2005, after all of the transactions had been authorized by the court and the townhouse had gone to closing. Neither the trustee nor counsel have any express time entries relating to tax basis, depreciation computations, capital gains or any other tax issue. There were a number of red flags. Real estate values rapidly increased in the last several years. One of the properties, the townhouse, seems to have been the debtor's primary residence until he purchased the house on November 25, 2000. The likelihood was that the townhouse became a rental property. This is significant. The deduction for sale of the principal residence is generally not applicable to investment property;[24] the property would have been depreciated; and it appreciated significantly in value. All suggest a tax liability. At the very least, the trustee should have examined the issue. But, there are no express time entries showing that either he or his attorney did so. This accounts for another $25,123, bringing the trustee's initial estimate of $483,400 available for unsecured creditors down to about $195,000.

## 5. Evaluation

The trustee should have analyzed the docketed judgments. The debtor owned a one-third interest in the townhouse when he filed bankruptcy. He had conveyed the townhouse to his wife and himself as tenants by the entirety on March 26, 2001, before judgment was entered against him and in favor of St. Anna's Home. St. Anna's Home docketed its judgment on November 29, 2001. It did not become a lien of record on either property at that time because both properties were titled in the debtor and his wife as tenants by the entirety. The individual judgment did not attach to

---

[24]There are also residency requirements which do not appear to have been satisfied.

17

tenants by the entirety property. *Williams v. Peyton (In re Williams)* 104 F. 3d 688 (4th Cir., 1997);

*Cordova v. Mayer (In re Cordova)* 73 F.3d 38 (4th Cir., 1996); *Sumy v. Scholssberg (In re Sumy)*,

777 F.2d 921 (4th Cir., 1985); *Greenblatt v. Ford (In re Ford),* 638 F.2d 14 (4th Cir. 1981).   On

December 26, 2002, the debtor and his wife conveyed the townhouse to themselves and Perez as

tenants in common.[25]  St. Anna's Home's docketed judgment immediately attached to the debtor's

one-third interest in the townhouse.   The debtor's one-third interest was fully encumbered by St.

Anna's Home's judgment lien.  All subordinate judgment liens, such as John Wagner Assoc., which

also attached on December 26, 2002, could be stripped off by virtue of Bankruptcy Code §506(a).

Thus, about $59,365 would be paid to St. Anna's Home as a secured claim in any event.   The trustee

would be left with a fund of about $135,635 if he prevailed in the avoidance action.[26]

The trustee should have evaluated the remaining docketed judgments against the balance of

the potential fund.  He should have confronted the interplay between *Tucker v. Foster,* 154 Va. 182,

152 S.E. 376  (1930) and Bankruptcy Code §544(a)(3).   *Tucker* holds that in Virginia a judgment

lien attaches to fraudulently conveyed property when the judgment is docketed even though the

property is not in the judgment-debtor's name.  Bona fide purchasers for value from the transferee

are protected.   Section 544(a)(3) makes the trustee a hypothetical bona fide purchaser from the

debtor.   The factual scenario is the reverse of the one faced by this court in *In re Stuckey,* 126 B.R.

697 (Bankr.E.D.Va. 1990).   Stuckey, the debtor, was the transferee of a fraudulently conveyed

property.   The trustee successfully invoked §544(a)(3) to prevent the defrauded creditor from

---

[25]There was no right of survivorship in the deed. *See In re Sampath,* 314 B.R. 73 (Bankr.E.D.Va 2004).

[26]This is one-third of the sales price less the mortgages encumbering the townhouse less the homestead exemption of $4,900. The computation is without considering the applicability of Bankruptcy Code §506(c) with respect to the realtor's fee. If §506(c) allowed one-third of the realtor's fee to be assessed against St. Anna's Home, the trustee's fund for unsecured creditors would be increased by $7,500.

18

recovering the property from the bankruptcy estate. In this case, the debtor is the transferor of the

fraudulent conveyance, and, until the property is recovered by the estate, it is not property of the

estate. *See* Bankruptcy Code §541(a)(3).

The trustee would have realized that if he were successful on that legal issue, he would have

a fund of no more than about $135,000 (less his attorney's fees) for unsecured creditors. If he were

unsuccessful, he would have nothing. This is the decision the trustee faced. He should have

reviewed the law and reached an informed decision. Here, though, there are no time records of any

such legal research or consideration by either trustee or his counsel. He ultimately settled with St.

Anna's Home, paying it $167,000.

## 6.  Litigation Considerations

If the trustee decided to proceed, the better approach would have been to file a single

complaint setting out in detail the title status of the property, the potential stake each party had in

the properties and the fraudulent conveyances. In this case, the extent and validity of the docketed

judgments is a matter of law likely to have been resolved by a well-pled motion for summary

judgment. The issue of the debtor's intent with respect to the underlying conveyances would

probably have still gone to trial, but the trustee could probably have resolved the status of the

docketed judgments at an early date. If he prevailed over St. Anna's Home on the house, he would

be assured – subject to prevailing on the underlying fraudulent conveyance action – of a significant

recovery for unsecured creditors. If he lost, he could have withdrawn or abandoned the complaint,

it being of no further benefit for unsecured creditors.

## 7.  Conclusion

The trustee did not undertake this analysis before he referred the matter to counsel and counsel did not undertake it before he filed the complaint.  There are no time entries by either the trustee or counsel indicating such an analysis.  The sequence of events as reflected on the court's docket and the trustee's and counsel's time records reflect that the critical information was obtained from time to time over the course of the administration of the estate and slowly led to the ultimate realization that this is a no-asset case.

## C.  Trustee's Final Report

The trustee's original final report was incorrect in several matters and was resubmitted.  First, there was no mention of the debtor's homestead exemption.  The debtor claimed his homestead exemption of $4,900 in the townhouse.  The exemption was scheduled on Schedule C and no objection was filed to it.  The trustee's original report neither reflected that it had been paid or that it would be paid.  *In re Allen,* 203 B.R. 925 (W.D.Va. 1997).  The trustee belatedly paid the exemption and amended his report.  The debtor never brought a §522(f) motion.

The second problem was that two secured creditors, Aguirre and Portillo,  who held judgment liens on the proceeds from the sale of the townhouse, were not scheduled to be paid as secured creditors.[27]  While the liens could have been pled as avoidable preferences in the adversary proceeding, they were not.  It is too late to do that now.

Third, the trustee classified the United States' criminal restitution judgment as a timely filed unsecured claim.  The settlement agreement stipulated that it would be treated as a tardily filed

---

[27]Aguirre's judgment is $966.00 together with interest and court costs.  Portillo's judgment is $1,392.00 together with interest and court costs.

unsecured claim entitled to distribution under §726(a)(2)(C).

Fourth, the trustee classified the unsecured portion of the Internal Revenue Service's claim as a timely filed unsecured claim. The Internal Revenue Service filed a late proof of claim asserting a priority claim of $76,627.97 and a general unsecured claim not entitled to priority of $12,245.32. The trustee properly classified the priority claim as a claim entitled to priority and scheduled it to be paid first after all administrative claims and before the unsecured claims. Bankruptcy Code §726(a)(1). He scheduled the unsecured claim as a general unsecured claim under §726(a)(2) to be paid pro rata with all other timely filed unsecured claims. The unsecured claim fell under §726(a)(2)(C) and should only be paid after all timely filed unsecured claims are paid in full.

Last, the trustee did not provide for the payment of deferred court costs for the filing of the two adversary proceedings.

### D. Post Petition Transfers

### 1. Alvarez Deed

There are specific, more substantive issues raised by the trustee's administration of the estate and counsel's handling of the litigation. The time records do not reflect any inquiry into the subordinate trusts on the two properties. There were four trusts on the townhouse. The third and fourth were to Greater Potomac Mortgage Company and Jose Alvarez, respectively, with pay-offs of $21,006.52 and $21,200.00, respectively.

The Alvarez matter remains unclear. The debtor owned a one-third interest of record and scheduled it on Schedule A as of the date he filed his petition. At the December 5, 2006 hearing on the trustee's final report, the trustee stated that the Alvarez document was a deed, not a deed of trust.

21

At the July 11, 2007 hearing, the trustee testified that the debtor, his wife and Perez conveyed the property to themselves and Alvarez by a deed dated and executed on February 4, 2004, and recorded on February 13, 2004.  The first meeting of creditors was held on February 5, 2004.  Debtor's counsel, who also prepared the debtor's schedules, appears to have prepared the deed.  Alvarez conveyed his interest in the property to the trustee by a deed dated March 30, 2005, and recorded on April 13, 2005.  The townhouse went to closing on June 7, 2005.  The settlement statement shows that the settlement agent disbursed $21,200 to Alvarez "per Trustee Inst."  The trustee testified that he was satisfied that the deed was in fact a disguised mortgage, that is, that Alvarez was really a lender not an owner of the property and that he was satisfied that Alvarez had, in fact, loaned the debtor $21,200.  Counsel's time records reflect that he learned of the Alvarez deed about than March 23, 2005, when he spoke with the title company that was to conduct the closing.  His time records reflect a 30 minute telephone call with the trustee that same day about the closing.  The trustee's time records for March 23, 2005, reflect three telephone calls with counsel about title matters.  They clearly relate to the Alvarez deed, one description referring to "debtor's transfer of ¼ interest in real property."  On March 25, 2005, trustee's counsel emailed debtor's counsel after having reviewed "title issues."  On March 30, 2005, the day Alvarez signed the deed to the trustee, trustee's counsel spoke with debtor's counsel concerning "deed, lien."  The time entry was 0.20 hours.  The trustee's time records contain no indication that he communicated with debtor's counsel during this time.  *See also Trustee's Supplemental Statement* (Docket Entry 179).

Counsel's first motion to sell the townhouse was filed on March 21, 2005, most likely before he or the trustee knew of the Alvarez deed.  *See Trustee's Supplemental Statement* at 2 (Docket Entry 179*)*.  The motion reflected a payoff of mortgages of $105,000.  That motion was denied for

22

the reasons stated in *In re Laines,* 352 B.R. 410 (Bankr.E.D.Va. 2005).  The second motion to sell

was filed on April 29, 2005.  This was after both counsel and the trustee knew of the Alvarez deed

and had decided to treat it as a lien.  However, the motion to sell stated that the payoff of the

mortgages was at $105,000, just as it had in the first motion.[28]   There was no other change in the

analysis of the expected distribution of the sales proceeds.  Both motions projected a net to the estate

after costs of sale, payment of mortgages and the expected trustee's fee of $217,350.  In short, no

adjustment was made for the payment of the Alvarez lien disguised as a deed.  It was not mentioned

as one of the seven liens that the property was to be sold free and clear of.

In short, the trustee's and counsel's analysis of the Alvarez deed appears superficial.  A

settlement was reached between debtor's counsel, acting on behalf of Alvarez, and the estate, but

the settlement was never disclosed to the court or approved by the court.  It may well have been an

appropriate settlement.  But, the reasons why the trustee felt the deed was a disguised mortgage are

not part of the record.  Debtor's counsel's involvement in this transaction, the transactions set aside

as fraudulent, and Patel's post-petition deed of trust is troubling.

## 2.  Wachovia Bank Credit Line Deed of Trust

Wachovia Bank was a post-petition transferee of the house.  Its deed of trust was recorded

on March 17, 2004.  It was a credit line deed of trust which typically allows advances from time to

time.  The trustee made no investigation of the timing or use of the advances on the Wachovia line

of credit until the court requested that the trustee address the matter by obtaining the loan history

from the bank.  The trustee ultimately did this.  The loan history reflects the first advance was made

---

[28]The estimated payoff appears to have been derived from the debtor's Schedule D which listed only two liens
secured by the townhouse, one for $60,000 and the second for $96,000.  Neither lender filed a proof of claim.

on March 9, 2004, when Fidel Rovira, one of the fraudulent transferees, obtained $52,212.  Rovira paid nothing for his interest in the property.  The second advance was on March 10, 2004, to Ana Laines, the debtor's wife, who obtained $20,000.  The first adversary proceeding was filed on March 31, 2004.  The outstanding balance on the credit line deed of trust on that day was $82,659.99, an additional $10,329.98 having been advanced the day before, March 30, 2004.  The memorandum of lis pendens was belatedly filed in October 2004.  No notice of commencement of the case was filed in the Fairfax County land records.  *See* Bankruptcy Code §549(c).  Notice of the filing of the case was not given to Wachovia because the trustee was unaware that the Wachovia credit line deed of trust existed.

    The Wachovia credit line deed of trust raises issues of what the trustee should have done.  The filing of the notice of commencement of Laines bankruptcy case could have affected Wachovia's decision to extend credit to Ana Laines and Rovira, however, because the loan was to Ana Laines and Rovira and not to the debtor and was secured by the home – property in which the debtor had no record ownership at that time – a notice of commencement of the case would probably not have affected Wachovia's decision to extend credit.  A title report, though, is entirely different.  If the trustee (or his counsel in preparing the complaint) had obtained a title report before he filed his first adversary proceeding, timely filed a memorandum of lis pendens and obtained a title bring-down from the initial title report to the date of the recordation of the memorandum of lis pendens, the estate would likely not have lost the entire $124,362.59.  While it is possible that there may have been no loss, the fact that the line of credit was drawn down by $82,659.99 by the time the complaint was filed on March 31, 2004, suggests that there would likely have been some loss.  Prompt notice to Wachovia of the pending litigation would likely have prevented further advances.

Wachovia bargained to become a lender, not a litigant. Early recognition of the transaction may have permitted the trustee to recover some of the funds from Ana Laines or Rovira. In short, the failure to protect the estate from potential improper transactions involving the targeted asset likely resulted in a loss to the estate. The failure to protect the estate by failing to conduct a title examination and timely file a memorandum of lis pendens is especially troubling because of the knowledge that his counsel obtained no later than April 7, 2004, of the debtor's indictment and the fact that there were two properties that the trustee sought to recover as fraudulent conveyances.

### E.  Disinterestedness of Trustee

The court's review of the record raises the question of whether the estate is fully administered and whether this trustee remains disinterested. A trustee cannot prevent every loss of estate property, but he is obligated to properly care for and preserve property of the estate. This includes protecting assets that he is seeking to recover. The questions presented are whether the trustee and his counsel discharged their duties. Had the trustee obtained a title report for the two properties that were the targets of his fraudulent conveyance suit when he first intended to avoid the transfers in early 2004, would he have been able to prevent some of the advances on the Wachovia credit line deed of trust? Would the filing of a memorandum of lis pendens immediately after he filed the complaint, either with or without actual notice to Wachovia, have forestalled the advances made after the complaint was filed? Would joining Wachovia as a party defendant because it had an interest in the property have forestalled the advances made after the complaint was filed? Can the trustee recover the advances from Rovira, Mrs. Laines or the debtor? Could he have recovered them if he had acted promptly in March 2004? While these questions focus on a single aspect of the

administration of the estate, there may be other issues to be explored.  For example, did the trustee
adequately supervise his attorney?  Did he (in effect) delegate trustee duties to his attorney?  *See In
re Computer Learning Centers,* 285 B.R. 191 (Bankr.E.D.Va.2002); Steven Rhodes, "The Fiduciary
and Institutional Obligations of a Chapter 7 Bankruptcy Trustee," 80 Am.Bankr.L.J. 147, 187-189
(2006).  The potential unadministered assets are the potential claims against the trustee and his
counsel.

The court held a hearing on these matters on July 11, 2007.  The trustee was of the opinion
that he remained disinterested and that there was nothing further to administer.  The only matters
that could be subject to further administration were claims against the trustee and his counsel for
improper administration of the estate resulting in a loss to the estate.  The losses, if any, arose from
the treatment of the Alvarez deed, the Wachovia credit line deed of trust including the recovery of
advances under the credit line deed of trust, the Aguirre and Portillo judgment liens and the delays
in the sale of the two properties arising from the manner in which the avoidance case was filed and
managed.

The trustee is of the opinion that the case was properly administered and that there are no
viable actions against either himself or his counsel.  The question of disinterestedness, though, does
not turn on the answer to the underlying questions, but whether the person answering the questions
is in a position to answer them without undue considerations that could affect his judgment.  At a
prior hearing, both the United States Trustee and the Internal Revenue Service were satisfied with
the trustee's administration of the estate and did not feel that a further review by a successor trustee
was necessary.  The view of the Internal Revenue Service is particularly important because after
payment of administrative expenses – there was a projected administrative insolvency of $14,408.24

26

– it would receive the next funds available for distribution.  The view of the United States Trustee should be given weight because the United States Trustee has supervisory responsibility for the panel trustees.  His office reviews every final report and should have a better overview of the case than individual creditors may have.  The court, on the other hand,  has an adjudicatory function, not an investigative function.  In most cases, the court never sees most of the information that counsel develop in preparing for trial.  That is undoubtedly true here relating to the trustee's discharge of his duties and the administration of the estate.

It is quite clear that there are issues with respect to the trustee's administration of this estate and his counsel's handling of the litigation.  Those issues are known to the United States Trustee and the Internal Revenue Service.  Because they are the only parties substantially affected, the court will defer to their views and find that this case has been fully administered.

### F.  Applications for Compensation

The applications for compensation of the trustee and his counsel are governed by Bankruptcy Code §330. *In re Computer Learning Centers, Inc.,* 285 B.R. 191, 229 (Bankr.E.D.Va. 2002) *appeal dismissed* 407 F.3d 656 (4th Cir. 2005).  The court may only award fees that are "reasonable compensation for actual, necessary services rendered by the trustee, . . . or attorney and by any paraprofessional person employed by any such person."  Bankruptcy Code §330(a)(1)(A).  Section 330(a)(3) continues:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> (A)    the time spent on such services;
> (B)    the rates charged for such services;

> (C)     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, important, and nature of the problem, issue, or task addressed; and
>
> (E)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in case other than cases under this title.

Section 330(a) is essentially a codification of the factors as discussed in *Blum v. Stenson*, 465 U.S. 886,104 S.Ct. 1541, 79 L.Ed.2d 891, (1984); *Daly v. Hill*, 790 F.2d 1071 (4th Cir.1986); *Harman v. Levin*, 772 F.2d 1150 (4th Cir.1985); *Ballard v. Schweiker*, 724 F.2d 1094 (4th Cir.1984); *Arnold v. Burger King Corp.*, 719 F.2d 63 (4th Cir.1983); *Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir.1978); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) and *In re King*, 88 B.R. 768, 770 (Bankr.E.D.Va.1988).

*Johnson v. Georgia Highway Express* sets out and discusses a non-exclusive list of factors similar to those in §330. Two of the twelve factors are especially relevant here – the skill requisite to perform the legal service property; and the amount involved and results obtained. In discussing these two factors, the court stated:.

> (3) *The skill requisite to perform the legal service properly.* The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration.
>
> .   .   .
>
> (8) *The amount involved and the results obtained.* Title VII, 42 U.S.C.A. §2000e-5(g), permits the recovery of damages in addition to injunctive relief. Although the Court should consider the amount of damages, or back pay awarded, that consideration should not obviate court scrutiny of the decision's effect on the law. If the decision corrects across-the-board discrimination affecting a large class of an employer's employees, the attorney's fee award should reflect the relief

28

granted.

*Id.* at 718.

The administrative insolvency in this case is the result of the failure of the trustee and his counsel to fully analyze the fraudulent conveyance cases before they filed them. They failed to obtain a timely title report. They failed to obtain reliable payoffs. They failed to timely file a memorandum of lis pendens. They failed to conduct a title bring down to the date of the recordation of the memorandum of lis pendens.

The trustee argues that he had no duty to advance the funds necessary to pay for the title reports. That may be true. A trustee is not the financier of a chapter 7 estate. However, he does have the obligation to properly administer the estate. To this end, he invests his time and effort without any assurance that he will be paid anything other than the statutory fee, and not even that in an *in forma pauperis* case. Counsel is required to satisfy Fed.R.Bankr.P. 9011 before he signs a complaint. This obligation requires a certain degree of due diligence. When title to real property is the issue in a case, a title report is usually necessary to satisfy that requirement. Here, the failure to obtain a title report necessitated the filing of a second suit to avoid the judgment liens. This caused unnecessary expense to the estate and delayed the sale of the properties. In this instance, the court can see no reason why all parties with any interest in the properties should not have been made defendants so that all rights and claims could have been brought before the court and determined in one proceeding. Wachovia filed a motion to intervene after the final order was entered in the first adversary so that it could protect its rights. While the motion was denied because the final order had already been entered and provided that non-parties would retain their lien positions unless later avoided, Wachovia's motion to intervene reflects the stake that other parties have in resolving a

fraudulent conveyance suit.  It would have been quite an embarrassment to the trustee if he had prevailed in the first suit but failed to prevail on the same issue in the second suit where he sought to avoid the liens.  While that did not happen, it could have if one of the omitted parties viewed the case differently or had information that was not previously available.

The Alvarez deed presented just such a possibility.  The Alvarez deed appeared on its face to convey the townhouse to a fourth individual.  Because Alvarez was not a party to the suit, his one-fourth interest was not avoided.[29]    The trustee says that Alvarez was without notice of the proceeding and was acting in good faith.  Thus, he concludes, the deed was not avoidable.  Had it not been merely a substitute for a deed of trust – an odd way for debtor's counsel, an experienced practitioner,  to document a loan – the estate would have lost not only the $21,200 loan but one-quarter of the property, and would have been required to commence another adversary proceeding to sell the interest of a co-owner under §363(f).

The cost of title work would have been about $125 for each property had the trustee utilized the services of an abstract company.  That is what the closing agent charged for the title report it obtained for closing.  This fee, in comparison to the $483,400 the trustee expected to have available for distribution to unsecured creditors is insignificant.  While not willing to advance $250 for title reports, he invested substantial time – both his and his counsel's.  At the July 11, 2007 hearing, he agreed that had he obtained the title reports, he would have filed a no-asset report.

A trustee is obligated to properly administer the bankruptcy estate.  He must perform appropriate due diligence.  This requires him to expend his time and effort and in some cases, to

---

[29]The trustee adds this cryptic footnote in the Trustee's Supplemental Statement in discussing Alvarez' deed: "The previous transfer to Perez was deemed void by the court on February 18, 2005."  If he is suggesting that the Alvarez deed is void because a prior transfer was avoided, he is mistaken.  This argument has been repeatedly rejected.  If his rejected argument was true, then he should have utilized it and prevented any payment to Alvarez.

advance small amounts.  If he is unwilling or unable to do this, he should not accept the appointment, or if having accepted it, resign.  While creditors cannot look to the trustee to bankroll the administration of a case – and the trustee may not be able to do so and remain disinterested – ordinary expenditures of time and ordinary advances may be necessary in order for the trustee to fulfill his statutory obligations.  Bankruptcy Code §704.  The court notes that in almost every asset case, trustee final reports request reimbursement of costs advanced by the trustee as either out-of-pocket cash expenditures or billable reimbursable expenses such as photocopy expenses.[30]  The court also notes that many professionals retained by bankruptcy estates regularly advance their own time and money to perform their duties.  Realtors may advance funds to have the grass cut while a vacant property is being marketed.  They may advance the costs to have the property cleaned.  Attorneys may advance filing fees or court reporter fees.  All the professionals know that their advances are at risk in a bankruptcy case.  If the case is not successful, they have no recourse.  They make these advances because they reasonably expect them to be repaid later in the case, but they also recognize that when they are not, they are a cost of doing business.  The trustee is no different from other professionals in this regard.

The trustee argues that there was a benefit to his administration of the estate.  While agreeing that he should not have administered it, he points out that St. Anna's Home received a substantial payment that, he says, it would not have otherwise obtained.  It received $167,000 in satisfaction of its claim.  The problem is that St. Anna's Home could have pursued its own fraudulent conveyance or voluntary conveyance suit.  The trustee's recovery was, ultimately, under the Virginia

---

[30]This trustee requests $100.15 and counsel requests $1,698.93.  This trustee requested reimbursement of $17,728.25 for computerized legal research in another case and $220.50 for court reporter fees.  *Computer Learning Centers, Inc.,* 285 B.R. 191, 233 (Bank.E.D.Va. 2002).

31

fraudulent conveyance statute, Va.Code (1950) §50-80, not Bankruptcy Code §548. There is no

reason to believe that St. Anna's Home could not have pursued its own rights in state court. Secured

creditors are also creditors and bankruptcy estates can be administered for their benefit. The United

States Trustee discourages administration of fully encumbered assets because it can give the

appearance that the trustee is using his position to generate work and fees for himself without any

benefit to the unsecured creditors. Additionally, where administration of fully encumbered property

is appropriate, the secured creditor should pay the costs of administration. It is unfair to the

unsecured creditors for the costs of administering fully encumbered property to be paid from funds

that would otherwise be distributed to them. In this case, the trustee requests that all funds

remaining after paying the St. Anna's Home settlement and the other secured creditors be paid as

administrative expenses.

The trustee properly notes that his complaint denied the debtor his discharge, a benefit to

unsecured creditors.

The court reviewed the adversary proceedings and concludes that they left much to be

desired. The deficiencies are noted above. A title report should have been obtained. The

memorandum of lis pendens should have been recorded months earlier. The two suits should have

been brought as a single suit. While counsel is correct that the Patel deed of trust post-dated the

filing of the complaint and would have required a subsequent suit in any event, it would have been

relatively simple and would have, as was Patel's claim in the second suit, disposed of on a motion

for summary judgment. The pleadings and counsel's time records show an insufficient knowledge

of the facts underlying the cases and of the applicable law. Counsel put forward a novel

interpretation of Bankruptcy Code §551 which would have denied the affected parties notice of the

proceeding and the opportunity to effectively contest the avoidance of their judgment liens. It reflected a fundamental misunderstanding of the avoidance process.

The professional judgments of the trustee and counsel were in several aspects very poor. They sought to obtain court approval of a settlement very favorable to Patel when Patel's claim, on its face, was tenuous at best. Their argument was that there was risk involved in trying Patel's claim and that if the estate lost, there would be no funds for unsecured creditors. That is an argument that is frequently made and accepted. But, it requires a factual basis. Here, there was none. Patel recorded his deed of trust despite the recordation of the memorandum of lis pendens. The facts were clear. The law was clear. Patel had little hope of success but the trustee proposed a generous settlement, a far too generous settlement. St. Anna's Home objected. The trustee withdrew the settlement and, after St. Anna's Home showed him how to proceed, prevailed on a motion for summary judgment.

The time records of the trustee and counsel do not reflect any significant legal research. They do not reflect sufficient investigation of the facts of the cases before they were brought. Counsel's complaint was sparse. It sought to avoid each of four transfers on each of four grounds when it was clear that the statutory basis could not be met on several of them. For example, three of the transfers were more than one year before the filing of the petition. Section 548 of the Bankruptcy Code could not reach them. But the claims were pled nonetheless. The trustee failed to show insolvency so as to prevail on three of the four voluntary conveyances under Va.Code (1950) §50-81. Worse, there was no evidence of insolvency on several critical dates. A more fully pled complaint, although not required under the Federal Rules, could easily have placed the trustee in a position to resolve many of the claims early in the proceeding on motions for summary

33

judgment. While reaching the issue of intent, a necessary element in a fraudulent conveyance suit, is a difficult issue to reach on summary judgment, it is possible that many of the avoidable judgments could have been reached on summary judgment. It appears almost certain that Maximo Portillo and Jose Donaldo Aguirre's judgments could have been avoided as preferences on motions for summary judgment. But, no preference claim was pled.

The motions to sell the real properties were poorly done. The analysis of the expected distributions to unsecured creditors were wildly wrong. No serious effort was made to obtain reliable payoffs before the trustee filed his complaints. When the Alvarez deed was discovered, no adjustment was made on the subsequent motion to sell the townhouse to reflect the additional lien to be paid. No tax analysis was done. None shows in the trustee's or counsel's time records. But, the motion makes it appear as though it was done. Only at the end of the case, after the taxable event had occurred, did the trustee seek professional advice and seriously look at the tax consequences of what had already been done.

The trustee's final report was incorrect in multiple respects. The errors were careless errors that ought never have been made in the first instance.

The trustee, interestingly, says that had he had a title report, he would not have sought to avoid the conveyances. There is something to be said for the proposition that the avoidance complaint should have been filed even if the trustee had had all the relevant information. This is because the resolution of the St. Anna's Home judgment lien was initially unclear. It relied on the application of *Tucker v. Foster*. There was much that could have been argued on both sides of that question. Ultimately, the trustee and St. Anna's Home settled the claim. That settlement reflects the inherent uncertainties with respect to that litigation. That issue was one that a well-pled

34

complaint could have framed so as to be easily reached by a motion for summary judgment. If the matter was resolved favorably to the trustee, the suit could have been prosecuted to a conclusion, with some benefit to the unsecured creditors. Otherwise, the trustee could have abandoned the suit. A settlement would have been a distinct possibility, but at least the trustee would have known at the beginning whether the settlement would have resulted in a benefit to the unsecured creditors.

The trustee saw a possible recovery of two fraudulent conveyances. He immediately referred the matter to the attorney he regularly employs in his asset chapter 7 cases. He did this without any significant evaluation of the avoidance actions or the likely results. This was the trustee's first mistake. He should have had a better basis than he in fact had to make the reference to counsel. He should have performed additional due diligence first. For example, his office could have contacted lenders to get realistic payoffs if the debtor did not provide him with recent loan statements. He could have had the titles examined, and should have in light of the debtor's answers on his Statement of Financial Affairs. At the least, in light of the information on the Statement of Financial Affairs, he should have had the judgment index checked. He may have intended to rely upon counsel to perform the due diligence. Counsel did not do it. The trustee should have recognized this before the complaint was filed. He should have been more insistent that his counsel provide him with sufficient information so that he himself could make the decision of whether to file the complaint or file a no-asset report. By failing to do so, the trustee essentially delegated this trustee decision to his counsel and lost control of the case.

While it is possible that the trustee and counsel caused an actual loss to the estate by their omissions with respect to the Alvarez and Wachovia matters, the principal reason that the trustee

projects this case as an administrative insolvency is that there were no assets available to administer in the first instance.  The trustee chased phantom assets.

The trustee's and counsel's fee applications will be substantially reduced.  While there was some benefit to St. Anna's Home and to the other creditors in the denial of the debtor's discharge, the fees requested are excessive in light of the quality of work performed and the results obtained. The court recognizes that the trustee and his counsel acted in good faith and that the principal error was chasing overencumbered property that resulted in an insufficient recovery.  Their fees will be reduced not because this case is an administrative insolvency but for the reasons discussed above.

## **Conclusion**

While the trustee and counsel billed many hours to the case, the lodestar analysis overstates the value of their efforts and the fees must be reduced.  The court will allow the trustee a fee in the amount of $12,000.00 and reimbursement of costs of $100.15.  This is approximately the maximum compensation allowable under Bankruptcy Code §326 based on the amount of funds available for distribution after payment of all secured claims.  Counsel will be allowed a fee of $7,500.00 and reimbursement of $1,698.93.  The balance of the funds will be paid, first to the other administrative claimants so that all administrative claims are paid in full, and then to the Internal Revenue Service on its priority claim.

Alexandria, Virginia
August 6, 2007

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copies to:

H. Jason Gold
Joel S. Aronson
Frank J. Bove
Robert K. Coulter

13197